IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Case No. 19-cv-02746

MARY LANSDEN SWAFFORD,
as trustee for the Mary Lansden Swafford
GST Exemption Residuary Trust, on behalf
of itself and on all others similarly situated,

    Plaintiff,

v.

NEWFIELD EXPLORATION COMPANY,
a Delaware corporation, and
NEWFIELD EXPLORATION MID-CONTINENT INC.,
a Delaware corporation,

    Defendants.

## CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

    Plaintiff[1] Mary Lansden GST Exemption Residuary Trust, through its trustee, on behalf of itself and the Classes of all others similarly situated, brings this Class Action Complaint against Newfield Exploration Company and Newfield Exploration Mid-Continent Inc. (collectively "Newfield"), and alleges and states the following.

---

[1] Because Mary Lansden Swafford, as trustee, brings this action on behalf of the Mary Lansden GST Exemption Residuary Trust, the term "Plaintiff," as used throughout this complaint, refers to the Trust.

## SUMMARY OF ACTION

1. Plaintiff, the Class, and the Subclass bring claims against Newfield concerning Newfield's actual, knowing, and willful underpayment or non-payment of royalties and oil-and-gas proceeds from wells through improper accounting methods (such as not paying on the starting price for gas products but instead taking improper deductions) and by failing to account for and pay royalties, all as more fully described below.

## JURISDICTION AND VENUE

2. This Court has original jurisdiction over the claims asserted in this complaint pursuant to 28 U.S.C. § 1332(d) because this is a class action for which the amount in controversy exceeds the sum of $5,000,000 and because members of the Classes and Newfield are citizens of different states.

3. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1) because Newfield maintains its principal place of business within this District.

## PARTIES

4. Mary Lansden Swafford is trustee of the Mary Lansden Swafford GST Exemption Residuary Trust (the "Trust" or "Plaintiff"), a trust organized under Oklahoma law. Plaintiff owns royalty interests in at least one Newfield-operated well that produces gas: the ELY 0104 1H-18X Well located at 19–1N–4W in Stephens County, Oklahoma. Plaintiff's royalty interests in that well stem from an oil-and-gas lease attached as **Exhibit 1**, which includes an Express Fuel Clause entitling Plaintiff to royalty for all gas used off the leased premises.

5. Newfield Exploration Company is a corporation organized under Delaware law with its principal place of business in Denver, Colorado.

6. Newfield Exploration Mid-Continent Inc. is a corporation organized under Delaware law and is a wholly owned subsidiary of Newfield Exploration Company. Newfield Exploration Mid-Continent Inc.'s principal place of business is in Denver, Colorado.

7. "Newfield," as used throughout this Complaint, encompasses both Newfield Exploration Company and Newfield Exploration Mid-Continent Inc.

8. On February 13, 2019, Newfield Exploration Company completed a merger with Encana Corporation, with Newfield Exploration Company surviving the merger as an indirect, wholly owned subsidiary of Encana. *See* Encana Corp. (Form 8-K) (Feb. 13, 2019), available at https://www.sec.gov/Archives/edgar/data/1157806/000119312519044440/d701379d8k.htm.

9. Newfield is in the business of producing and marketing oil-and-gas and constituent products from the wells in which the Class members hold interests.

10. Newfield and its affiliated predecessors, successors, and current and past employees, agents, representatives, attorneys, or others acting on their behalf and all those to whose prior leasehold interests they have succeeded and for whom they are legally liable whether by merger, assignment, or otherwise shall herein collectively be known as "Defendant" or "Newfield."

11. The acts charged in this Complaint as having been done by Newfield were authorized, ordered, or done by officers, agents, affiliates, employees, or representatives, while actively engaged in the conduct or management of Newfield's business or affairs, and within the scope of their employment or agency with Newfield.

**CLASS ALLEGATIONS**

12. Plaintiff, through its trustee, brings this action on behalf of itself and as a class action pursuant to Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure on behalf of the following class and subclass ("Class" and "Subclass"):

3

> All royalty owners in Oklahoma wells where Defendant (including its affiliated predecessors and affiliated successors) are or were the operator (or a working interest owner who marketed its share of gas and directly paid royalties to the royalty owners). The Class claims relate to royalty payments for gas and its constituents (such as residue gas, natural gas liquids, helium, nitrogen, or drip condensate).
>
> **SUBCLASS**: All persons entitled to share in royalty proceeds payable under any lease that contains an express provision stating that royalty will be paid on gas used off the lease premises ("Express Fuel Clause").
>
> Excluded from the Class and the Subclass are: (1) agencies, departments or instrumentalities of the United States of America, including but not limited to the U.S. Department of the Interior (the United States, Indian tribes, and Indian allottees); (2) the State of Oklahoma or any of its agencies or departments that own royalty interests; (3) Defendant, its affiliates, predecessors, and employees, officers, and directors; (4) any publicly traded company or their affiliated entity that produces, gathers, processes, or markets gas; (5) the claims of royalty owners to the extent covered by arbitration clauses or prior settlement agreements, if any, still in effect at the time suit was filed herein; (6) overriding royalty owners and others whose interest was carved out from the lessee's interest; (7) royalty owners who have already filed and still have pending lawsuits for underpayment of royalties against Defendant at the time suit is filed herein; (8) royalty owners only to the extent they take gas in-kind, if any; and, (9) royalty owners only to the extent receiving "Blanchard" payments.

13. The members of the Class and the Subclass are so numerous and geographically dispersed that joinder of all members is impracticable.

14. Newfield operates or has operated hundreds, if not thousands, of Class Wells that produce gas. Newfield holds a working interest in these Wells, with at least one, and usually multiple, royalty owners for each well.

15. Newfield has within its possession or control records that identify all persons to whom it (including affiliated predecessors and those for whom it is legally responsible) has paid royalties from Class Wells during the Class Period.

16. The questions of fact or law common to Plaintiff, the Class, and the Subclass include, without limitation, one or more of the following:

4

  a. Whether Plaintiff and members of the Class are beneficiaries of the implied Marketable Condition Rule (MCR), which requires Newfield to sever the gas from the ground and to prepare the gas for market at Newfield's sole expense.

    i. If so, whether: 1) the Midstream Costs of gathering, compression, dehydration, treatment, and processing (GCDTP) are costs associated with preparing the gas for market such that none of them should have been deducted from royalties but all of them were; or 2) whether the market for gas occurs before GCDTP are incurred such that the Class's claim is only for excessive deductions of Midstream Costs.

    ii. If not, whether the Class members were party to a lease that expressly allows deduction of all of the GCDTP Midstream Costs ("Express Deduction Lease" or "ED Lease"), such that these Class members have a claim only for excessive deductions of Midstream Costs, and if so, whether the Midstream Costs actually deducted were excessive in amount.

  b. Whether Newfield paid royalty to Plaintiff and members of the Class for all valuable constituents coming from their wells and which inured to Newfield's benefit either: (1) through credit toward the Midstream Costs; or (2) by contractual consideration in-kind to a midstream company (such as drip condensate, helium, liquefied nitrogen, some percentage of residue, some percentage of fractionated NGLs, plant fuel, or FL&U).

  c. Whether Newfield (including any of its affiliates) paid royalty to Plaintiff and members of the Class based on a starting price below what Newfield or its affiliates received in arm's-length sales transactions.

  d. Whether the Subclass leases contain Express Fuel Clauses.

    i. If so, whether Defendant failed to pay for the gas from the Subclass Wells used off the leased premises.

  e. Whether class-wide damages can be calculated for Plaintiff's theories of liability.

17. Plaintiff is typical of the other Class members because Newfield pays royalty to Plaintiff and other Class members using common methods. Newfield pays royalty based on the net revenue Newfield receives under its gas contracts which terms royalty owners do not know or approve. The contracts are for services necessary to place the gas and its constituent parts into

5

marketable condition so they can be sold into recognized, active, and competitive commercial markets.

18. Further, Plaintiff is typical of the other Subclass members because its oil-and-gas lease contains an Express Fuel Clause.

19. Plaintiff, through its trustee, will fairly and adequately protect the interests of the members of the Class and the Subclass. Plaintiff's trustee understands her duties as representative for the Class and the Subclass. Plaintiff has retained counsel competent and experienced in class action and royalty owner litigation.

20. This action is properly maintainable as a class action. Common questions of law or fact exist as to all members of the Class and the Subclass, and those common questions predominate over any questions solely affecting individual members of such Class. *See supra*, ¶ 16. There is no need for individual members of the Class and the Subclass to testify in order to establish Newfield's liability to or damages sustained by Plaintiff and members of the Class and the Subclass.

21. Class action treatment is appropriate in this matter and is superior to the alternative of numerous individual lawsuits by members of the Class and the Subclass. Class action treatment will allow a large number of similarly situated individuals to prosecute their common claims in a single forum, simultaneously, efficiently, and without duplication of time, expense and effort on the part of those individuals, witnesses, the courts, and/or Newfield. Likewise, class action treatment will avoid the possibility of inconsistent and/or varying results in this matter arising out of the same facts. No difficulties are likely to be encountered in the management of this class action that would preclude its maintenance as a class action and no superior alternative forum exists for the fair and efficient adjudication of the claims of all the Class and the Subclass members.

22. Class action treatment in this matter is further superior to the alternative of numerous individual lawsuits by all or some members of the Class and the Subclass. Joinder of all of the Class and the Subclass members would be either highly impracticable or impossible. And the amounts at stake for the individual Class and the Subclass members, while significant in the aggregate, would be insufficient to enable them to retain competent legal counsel to pursue claims individually. In the absence of a class action in this matter, Newfield will likely retain the benefit of its wrongdoing.

## GAS INDUSTRY BACKGROUND

23. The members of the Class own royalty interests in wells that produce gas and constituents that are transformed into marketable products and sold into the established commercial markets for those products.

24. Newfield's method for calculating the royalty owed to the members of the Class is subject to uniform accounting procedures and implied marketable product law.

25. Oklahoma law requires the lessee to bear all of the costs of placing gas and its constituents into "Marketable Condition" products.

26. Gas and its constituent parts are marketable products only when they are in the physical condition to be bought and sold in a commercial marketplace.

27. Only after a given product is marketable does a royalty owner have to pay its proportionate share of the reasonable costs to get a higher enhanced value or price for that particular product.

### The Lessor-Lessee Relationship

28. The lessor owns minerals, including oil and gas; the lessee has the money, labor, and know-how to extract, condition, and market those minerals. The lessor and lessee enter into a

lease that allows the lessee to take the minerals from the lessor's land. The usual revenue split from a well was 1/8th to the lessor (royalty owner) and 7/8ths to the lessee. As the risk of finding oil and gas has diminished over time, due to the prevalence of wells delineating the field, better seismic technology, and increased efficiency of drilling rigs, royalty owners on more recent leases have received 3/16th or even 1/4th of the revenue.

29. But, oil-and-gas companies have used undisclosed, internal accounting practices to try to keep for themselves as much of the well revenue as possible. These accounting practices are at the heart of every oil-and-gas royalty case.

30. Rather than adopting transparency in its royalty-calculation formula, Newfield, like most lessees, has guarded its production and accounting processes as confidential or proprietary, thereby, depriving the royalty owners of information necessary to understand how Newfield calculates royalties. Consequently, the royalty owner is unaware of the lessee's actual practices, thereby enabling the lessee to breach the oil-and-gas lease without accountability.

31. If and when one or more of the royalty owners learn of the "breach," the royalty owner has only three options—all of which are poor: (1) confront the lessee and maybe get paid while the lessee continues to retain improperly garnered gas revenues from thousands of other unknowing royalty owners; (2) do nothing since the "breach" only results in a modest yearly loss and the expense of individual litigation would exceed the recovery, if any; or (3) file a class action lawsuit which will persist for years and probably will not recover the full loss. In short, if the lessee breaches, it may never be held accountable; and if a royalty owner complains, the lessee will still come out ahead because an individual case is not worth much and a class action rarely requires 100% repayment to royalty owners plus prejudgment interest, plus attorneys' fees and expenses. The class action is the best of the three options, hence the filing of this class action lawsuit.

8

**Residue Gas, Helium, Nitrogen and Natural Gas Liquids Production**

33. The gas is gathered from each well, dehydrated and compressed, through underground gathering lines crossing many miles of land to processing plants where the raw gas is transformed into two primary products: methane and fractionated natural gas liquids ("NGLs"). Once homogenized as fungible products, the residue gas and NGLs are sold in the commercial market.

**Wellhead (Basic Separation and Gas Measurement)**

33. The diagram below illustrates the gas conditioning process:



*See* http://www.kgs.ku.edu/Publications/Oil/primer13.html (last visited Sept. 11, 2019).

34. Wells produce oil, gas, and a host of other products, such as water, helium, nitrogen, etc., all mixed together in the gas stream.[2] After the stream comes out of the ground, it enters the

---

[2] Hydrocarbons can vary in chemical makeup (from simple methane to complex octane) and in form (from pure gaseous state to liquid condensate). The non-hydrocarbon makeup of the well-stream that includes natural gas can also include gases such as helium, sulfur, carbon dioxide,

9

free water knockout (a/k/a three-phase separator) which separates the products by gravity, water at the bottom, oil in the middle, and gas going out the top. Due to the low technology, the separator is not expensive (the "separation cost"). The gaseous mixture (with helium, nitrogen, NGLs, and other gaseous substances) passes from the separator into the gas line.[3] The remaining fluid goes through the heater-treater where heat, gravity segregation, chemical additives and electric current break down the mixture more clearly in oil and water. The heater-treater is installed, maintained and takes fuel to operate (the "heater-treater cost"). The water is drained off and sent for salt water disposal. The oil that is separated at the wellhead is collected in a tank, usually trucked out and sold (the payment of oil royalties is not at issue in this action).

35. Since production over time depletes the pressure of a well, on rare occasion, on-lease compressors are installed to suction gas out of the well or to move the gaseous mixture down the gathering lines. But when they are installed, their use requires fuel (the "on-lease compression" or "vacuum compression" cost).

36. The gaseous mixture produced from a single well cannot be processed economically, so the mixtures from many wells are "gathered" together through gathering lines and delivered to a processing plant for transformation into marketable products and sale into commercial markets. This results in a gathering cost (G). The below diagram provides an overview of the

---

and nitrogen. This mixture of many gaseous elements and substances is often referred to as the "gas stream" or just "gas".

[3] A minute portion of this raw gas may be used on a few leased lands to heat the farm house pursuant to a free gas clause in the lease. Although title to the gas sometimes is purportedly transferred, this is not a true sale. Some producers sell less than 3% of the raw gas to a local irrigator during the summer months for agricultural purposes, but this is not the economic market for which the wells are drilled.

midstream services deduction process. Newfield does not improperly deduct from royalty any of the costs before the gathering line inlet.

**Midstream Services (GCDTP) Deductions**



37. As the gaseous mixture from each well enters the gathering line, it flows into a meter run where the mixture is measured for both volume (in Mcf) and quality (Btu content) (combined, "gas measurement," in MMBtu). The meter run must be constantly maintained to record accurate measurements.

38. Gathering pipelines are usually made of metal that could be corroded by water vapor (and other corrosive gases) in the gaseous mixture, so a glycol dehydrator is used to remove the water vapor. This results in a dehydration cost (D).

11

39.     Gas will not move downstream from the well unless it is pressurized sufficiently to overcome the in-line back pressure and friction in the gathering line. So large gas compressors are installed to move the gas from the gathering line inlet to the processing plant. These compressors are expensive and require fuel to operate. This results in a compression cost (C).

40.     The gathering pipelines themselves cost money to lay and maintain, though most have been in place for decades. Gas condensate (gas condensed into liquid as it cools and is pressurized) ("Drip Condensate") is collected at points along the gathering lines as a result of cleaning or "pigging the line" and is captured for fractionation and sale later. Generally lessees pay no royalty on the revenue generated from the sale of the drip condensate.

41.     Finally, gathering lines leak, especially as they age, resulting in lost and unaccounted for gas ("L&U"). Lessees pay no royalty on the volume of L&U.

### Natural Gas Processing

42.     Once a sufficient amount of the gas mixture from multiple wells (and often from multiple gathering systems) is gathered, the mixture enters the inlet of the processing plant where the mixture will be transformed into methane and mixed NGLs.

43.     Lessees, such as Newfield, use gas processing plants that either they or a third party own. Usually an unrelated third party owns the processing plant but the plant may also be owned in whole or in part by a lessee.

44.     The plant removes impurities that remain in the mixture, such as carbon dioxide, nitrogen, or sulfur, before the mixture can be processed. This incurs a "treatment cost" (T).

45.     The final cost, processing (P), involves services to transform the gas mixture into methane gas (also called "residue gas"), NGLs raw make, and in the Panhandle of Oklahoma, crude helium.

      a.    Methane must meet the quality standards for long-haul pipeline transmission set by the Federal Energy Regulatory Commission ("FERC") which is called "pipeline quality gas".

      b.    The raw make NGLs are used as a feedstock in the petrochemical and oil refining industries; they are a more valuable commodity than methane. To separate the NGLs from the gaseous mixture, they are cooled to temperatures lower than minus 150°F (the "Cryogenic or cooling process"). The NGLs move into a liquids pipeline and processed by a fractionator into their marketable products: ethane; propane; butanes; and pentanes plus. In the gas contracts, this process incurs a "T&F" or "fractionation" fee, even though lessees sometimes give away the NGLs in keep-whole agreements as consideration for other services the midstream company provides.

      c.    Helium is processed into Grade A helium at new processing plants or into crude helium (contaminated with nitrogen) at older plants which is then processed into Grade A helium at a nearby helium processor (often a few hundred feet away).

46.    This total processing system involves expensive equipment and requires fuel to operate (collectively, the "processing charge" and/or "plant fuel"). Lessees do not pay royalty on plant fuel, even though it comes from Class Wells.

47.    At the tailgate of the processing plant, at least two products emerge: (1) residue gas (or methane gas); and, (2) NGLs (usually a mixture of NGLs, known as "raw make" or "Y" grade). In helium rich production areas, Grade A or crude helium, along with liquefied nitrogen also emerges. But none of these products are commercially marketable at that point.

### Marketable Condition for the Products

48.    *Methane Gas*. Methane gas (or residue gas) is commercial quality (a/k/a "pipeline quality") at the tailgate of the processing plant only after it is further pressurized to enter the transmission line by a booster compressor (the "booster compression" cost).

49.    *NGLs*. The raw mixture of NGLs at the tailgate of the processing plant is not commercially marketable. It must be fractionated into commercially marketable products – ethane,

13

propane, butane, isobutene, natural gasoline, etc. In computing royalty for NGLs, Newfield improperly deducts processing fees and/or other costs (such as transportation and fractionation, T&F) needed to reach commercially marketable fractionated NGLs.

50.     *Drip Condensate*. Drip Condensate is recovered on the gathering lines and at the inlet to the processing plant, and is essentially in marketable condition when collected.

51.     *Other Products*. In some areas of the country (e.g., in the Hugoton Field, which stretches across Southwest Kansas, the Oklahoma Panhandle, the Texas Panhandle, and into parts of Wyoming), helium is produced in commercial quantities and recovered, along with liquefied nitrogen. Other areas of the country produce sulfur and carbon dioxide in commercial quantities. When such products are available in commercial quantities, processing and treatment plants recover these valuable constituents but for them, historically, lessees pay little or nothing to the royalty owners. Royalty owners should be paid for the gas and all constituents taken.

## Sale of Products

52.     To turn the marketable products into money, the producer sells them (or contracts to have them sold) in the commercial market place in an arm's length transaction. No money exchanges hands until the residue gas is sold at the Index pool, the fractionated NGLs at OPIS, and any other marketable products at the prices established by their respective commercial markets. Lessees attempt to obscure this fact with self-serving language in gas marketing contracts about title transfer or even by creating a wholly owned affiliate to manufacture a fictitious "sale" before the gas reaches commercial quality for sale.

53.     The "starting price" for gas products is always achieved, as it must be, at a commercial market price. All of the gas contracts express the commercial market price in one of two ways: (a) a market price, called an "Index" price for residue gas and "OPIS" price for fractionated

14

NGLs, or (b) a "weighted average sales price" or "WASP" achieved at the same residue Index market or OPIS market. The difference stems from Newfield's market power to, over time, obtain above "Index" or "OPIS" price in its arm's length sale. Whichever starting price is used in an arm's length transaction, that price is the highest and best reasonable price for the valuable gas products. If Other Products are also produced, they are and must be also priced in a commercial market.

54. Affiliate gas contracts are not arm's-length sales in a commercial market. Instead, the later arm's-length sale by the affiliate in the commercial market is the true sale that should be used as the "starting price" for marketable condition gas products.

    a. Some lessees contract with affiliated gathering companies or other affiliated gas service providers before the products (residue gas and/or NGLs) are in Marketable Condition in an effort to: (1) artificially, and improperly, create a commercial market where none truly exists so they may justify deducting costs from royalty, or not paying for all of the gas or constituent products produced; (2) charge "marketing fees" to royalty owners even though the lessee is already obligated under the lease to prepare the gas for market and market the gas and constituent products; and/or (3) pay on the lower lessee/affiliate sale price and not the higher affiliate/third party price.

    b. WASP involves a pool of sales transactions to third parties (and/or affiliates) and combines the prices paid by those third parties (and/or affiliates) to arrive at a "weighted average sales price." Lessees can manipulate this process by using lower lessee/affiliate sales prices for part of the pool price, rather than all third party arm's length sale prices.

55. Fictitious "sales" (also known as sham sales or conditional sales) are created by lessees in an effort to pass off a non-commercial market sale as if it should be the starting point for royalty payments. But none of these efforts comport with economic reality or are in good faith with respect to royalty owners. For instance:

    a. Anything of value can be sold at any place and in any condition.

    b. Gas and other minerals can and are routinely sold in the ground, but they are not in marketable condition.

    c. Gas could be sold at the bottom of the hole when it is severed from the surrounding rock and enters the downhole pipe. Although a contract driller

        might be willing to accept some percentage of the future sale of oil or gas in the real marketplace as compensation for his drilling services, that agreement does not make the transaction a real market sale.

d.     Gas could be sold "at the wellhead" when the gas is severed from the surface. Although a contract operator might be willing to accept some percentage of the future sale of oil or gas in the real marketplace as compensation for his well operating services, that transaction does not make it a real market sale.

e.     Gas also could be sold at the gathering line inlet when the gas enters the gathering line and changes custody. Although a contract gatherer might be willing to accept some percentage of the future sale of gas in the real marketplace as compensation for his gathering services, that transaction does not make it a real market sale.

f.     Gas also could be sold at the processing plant inlet when custody of the gas changes to the processing plant. Although a contract processor might be willing to accept some percentage of the future sale of gas in the real marketplace as compensation for his processing services, that transaction does not make it a real market sale.

g.     The lessee could simply pay for all of these services with monetary fees or in-kind contributions of all or part of the valuable constituents. But the structure of the transaction does not change the fact that the services are necessary to prepare the gas and valuable constituents for the first real sale into the commercial market – Index or OPIS.

h.     Nor does a contract saying title transfers at a custody transfer point create a sale of marketable products in a real commercial market. Some gas contracts with Midstream companies that provide GCDTP services purport to do that, but other parts of the gas contract demonstrate that it is a poorly attempted legal sleight of hand as (i) the risk of loss that usually passes with a true title transfer and market sale does not happen; (ii) the cost of future downstream services that usually passes with a true title transfer and market sale does not happen; (iii) the starting price that would occur with a true title transfer and market sale does not happen. Indeed, the paper title transfer is unnecessary to receiving the Midstream services as the gas could (and sometimes does) receive the exact same Midstream services without the paper title transfer.

i.     All of the gas contracts implicitly recognize this paper title transfer fiction, as the starting price for gas products always is at the Index and OPIS market pool as previously described.

j.     Midstream services providers are not buyers and resellers of raw gas. They are service providers that convert raw gas into pipeline quality gas so it can

16

enter the Index or OPIS market pools. Indeed, they are called Midstream servicers, not Midstream purchasers.

### Different Ways Newfield Underpays Royalty Owners

56. The extraordinarily large dollars at stake and the one-sided nature of the gas lessor-lessee relationship are constant temptations to lessees to wrongfully retain gas revenues. All payment formulas, all affiliate and non-affiliate contractual relationships, and all calculations are firmly kept in the exclusive control of lessees, *and* they involve undisclosed accounting and operational practices. As a result, there are many ways that royalty owners are underpaid on their royalty interests, and they never know it. The common thread through all of these schemes is that they are typically buried in the internal lessee accounting systems or royalty-payment formulas.

57. Newfield represents the royalty calculation on the form of a monthly check stub it sends each royalty owner. The check stub shows each royalty owner's interest and taxes (which are not in dispute here), and volume, price, deductions, and value, all of which are disputed.

58. Newfield underpays royalty to Plaintiff and other Class Members in one or more of the following ways:

    a.  *Residue Gas*. The starting price paid for residue gas should be an arm's length, third party market sales price for residue gas at pipeline quality. All of Newfield's gas contracts will show this to be true. But, instead of paying on that gross competitive price, Newfield pays on a net price after directly taking or allowing midstream companies to indirectly take Midstream Services deductions (both monetary fees and in-kind volumetric deductions).

    b.  *NGLs*. The starting price paid for fractionated NGLs should be an arm's length, third party market sales price for ethane, propane, normal butane, iso-butane, and pentane plus (a/k/a natural gasoline). All of Newfield's gas contracts will show this to be true. But instead of paying on that gross competitive price, Newfield pays royalty (i) for only some of the NGLs produced (some is lost and unaccounted for in the gathering process, lost in plant fuel or compression fuel); (ii) after deducting processing fees and expenses (often keeping in-kind a Percentage of the Proceeds ("POP") of the fractionated NGLs as payment for the processing services); and, (iii) after reducing payment by T&F.

17

    c.    *Drip Condensate*. Plaintiff and Class Members' wells produce heavy hydrocarbons that condense in the pipeline. Newfield (or a third-party on behalf of Newfield (gatherers and/or processors)) recovers those hydrocarbons for sale. Newfield fails to pay any royalty for that Drip Condensate.

    d.    *Other Products*. Helium is contained in the well-stream produced from Plaintiff's and many Class Members' wells, but Newfield: (i) fails to pay royalty for all of the helium produced (some is lost and unaccounted for in the gathering and processing process); (ii) deducts processing fees and costs even though the helium is not yet in commercial grade; and (iii) pays at a lower than commercial Grade A price. Often times, Newfield does not pay any royalty at all for Helium, for liquid nitrogen, or other products taken from Plaintiff and the Class Members' wells.

59. Newfield underpays all other Class Members from whom Newfield is legally and expressly authorized in the terms of the oil and gas lease to deduct post-production midstream services costs, by taking excessive deductions under midstream Sservices contracts that allow excessive monopoly charges for GCDTP services.

60. Newfield underpays Subclass Members by failing to pay royalties on fuel used off the lease premises despite express contractual obligations to do so.

61. The underpayment and non-payment of royalties are done with Newfield's actual and willful knowledge and intent.

62. Newfield is well familiar with the fact that many other producers in Oklahoma have resolved the same claims for hundreds of millions, if not billions, of dollars or have changed their royalty payment practices to cease improperly deducting.

63. Nevertheless, Newfield continues its improper payment practices with actual and willful knowledge and intent.

## CAUSE OF ACTION
## BREACH OF LEASE

64. The allegations set forth above are incorporated herein by reference.

18

65. Plaintiff and the other Class Members entered into written, fully executed, oil-and-gas leases with Newfield, and those leases include implied covenants requiring Newfield to prepare the gas and its constituent parts for market at Newfield's sole cost. And, for the Subclass, the Express Fuel Clauses required Newfield to pay royalty on fuel used off the leased premises. The leases also place upon Newfield the obligation to properly account for and pay royalty interests to royalty owners under the mutual benefit rule and good faith and fair dealing.

66. At all material times, Plaintiff, the Class, and the Subclass members have performed their terms and obligations under the leases.

67. Newfield breached the terms of the leases, including the implied covenants, by its actions and/or inactions in underpaying royalty or not paying royalty on all products sold from the gas stream.

68. As a result of Newfield's breaches, Plaintiff and the Class members have been damaged through underpayment of the actual amounts due.

69. Further, Plaintiff and the Subclass members have been damaged by Newfield's failure to pay for gas used off the leased premises, which is a breach of the Express Fuel Clauses.

70. Plaintiff, the Class, and the Subclass are entitled to the actual damages caused by Newfield's breaches and are further entitled to statutory interest and other allowable damages imposed by Oklahoma law, including punitive damages. *See* OKLA. STAT. tit. 52, § 570.1 *et seq.*

## PRAYER FOR RELIEF

Wherefore, premises considered, Plaintiff seeks:

  a. An order certifying and allowing this case to proceed as a class action with Plaintiff as class representative for the Class and the Subclass and its undersigned counsel as class counsel for the Class and the Subclass;

  b. An order requiring Defendants to pay Plaintiff and all Class and Subclass members actual damages to fully compensate them for losses sustained as a direct,

   proximate, and/or producing cause of Defendants' breaches and/or unlawful conduct including, without limitation, the compound interest required by Oklahoma law;

c.  An order requiring Defendants to pay Plaintiff, the Class, and the Subclass's attorney's fees and litigation costs as provide by statute; and

d.  Such costs and other relief as this Court deems appropriate.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a jury trial on all matters so triable.

     Respectfully Submitted,

     s/ Reagan E. Bradford
     *Reagan E. Bradford*
     *Margaret E. Robertson*
     *Ryan K. Wilson*
     THE LANIER LAW FIRM, P.C.
     431 W. Main Street, Suite D
     Oklahoma City, OK 73102
     Telephone: (405) 698-2770
     Facsimile: (405) 234-5506
     reagan.bradford@lanierlawfirm.com
     maggie.robertson@lanierlawfirm.com
     ryan.wilson@lanierlawfirm.com

     *-and-*

     *Matthew Mitzner*
     MITZNER KAWALEK LLP
     Thanksgiving Tower
     1601 Elm Street, Suite 1995
     Dallas, TX 75201
     Telephone: (214) 810-1488
     matthew@mk-llp.com

     **COUNSEL FOR PLAINTIFF**